SHAW, Justice (concurring in part and dissenting in part).
As to the rulings of the main opinion on the psychotherapist-patient privilege and the quality-assurance privilege in Ala. Code 1975, § 22-21-8, I concur. As to the portion of the main opinion discussing the applicability of the Alabama Medical Liability Act ("the AMLA")[6] in this case, I respectfully dissent.
In discussing whether the AMLA applies in this case, the main opinion in part relies on the decision in Ex parte Vanderwall, 201 So.3d 525 (Ala. 2015). I dissented from that decision, but I do not believe that it commands the result in this case. It states: "[T]he AMLA is not just concerned with who committed the alleged wrongful conduct or when and where that conduct occurred, but also with whether the harm occurred because of the provision of medical services." 201 So.3d at 537. Not only does Ex parte Vanderwall acknowledge that "when and where" the wrongful conduct occurs is relevant, the analysis can also look to whether harm occurred because of the provision of medical services. To me, all of those factors are relevant in the instant case.
In its petition for a writ of mandamus, Altapointe[7] argues as follows:
" 'The Legislature declared that it enacted the AMLA in response to increasing health-care costs caused by "the increasing threat of legal actions for alleged medical injury." ' Ex parte Vanderwall, 201 So.3d 525, 537 (Ala. 2015) (quoting Ala. Code § 6-5-540 (1975) (citations omitted)). Thus, the AMLA will apply to actions against healthcare providers alleging a 'breach of the standard of care.' Ala. Code § 6-5-540 (1975). A breach of the standard of care is defined as the 'fail[ure] to exercise such reasonable, care, skill and diligence as other similarly situated health care providers in the same general line of practice, ordinarily have and exercise in a like case.' Ala. Code § 6-5-548 (1975). This Court has interpreted the AMLA to apply to 'conduct that is, or that is reasonably related to, the provision of health-care services allegedly resulting in a medical injury.' Ex parte Vanderwall, 201 So.3d at 537 (citations omitted).
"Here, the standard of care applicable to Altapointe is to provide residential and mental health care in accordance with other similarly situated residential mental health facilities. Providing residential care was an integral part of the medical care that Hunter Avnet received while at Country Wood Court Group Home. Hunter Avnet's mental illness prevented him from being able to independently live and care for himself, hence his residency at Country Wood. The attack on Hunter Avnet occurred *1119 during his residency. Thus, Hunter Avnet's injuries, and subsequent legal claims, arose out of the rendition of healthcare services.
"Avnet himself characterizes the claims against Altapointe as based upon the 'fail[ure] to provide a reasonably safe environment at the Country Wood Court Group Home.' The very purpose of Country Wood is to provide residential care in conjunction with mental health services. Thus, providing a safe residential environment is both the basis of the applicable standard of care and Avnet's Complaint.
"Importantly, as part of Avnet's claims, he is asserting that Altapointe knew or should have known that Kerdeus Crenshaw was violent, and thus should have prevented the unexpected attack. In fact, Avnet claims that 'the remainder of the [discovery] requests are clearly tailored to discover factual information concerning this event and what Altapointe knew about Kerdeus Crenshaw's potential for violence.' In fact, Avnet has gone as far as to request:
" 'A complete copy of the resident file of K[e]rdeus Crenshaw, including but not limited to: write-ups, disciplinary reports, disciplinary actions, hospitalizations, list of medicines, therapeutic notes, progression notes, interview notes, therapy notes, and any other type of report, memo, or note, that in any way touches or concerns K[e]rdeus Crenshaw.'
"The only source for Altapointe's alleged knowledge about Crenshaw can only come from Crenshaw's medical records/mental health treatment. Thus, Avnet's own allegations point to one logical conclusion: that the AMLA applies to this action.
"... This case implicates the provision of medical services to the actual plaintiff within the context of a patient-hospital (or residential facility) relationship. ... Moreover, Avnet's injury actually occurred during the provision of healthcare services."
Altapointe's petition, at 12-15 (citations to exhibits omitted).[8]
Altapointe is not arguing that the AMLA applied, as the main opinion states, "solely on the fact that the attack occurred in its facility," 249 So.3d at 1113, but also because the duty it allegedly breached was the failure to provide a reasonably safe environment at the facility, i.e., to properly house mental-health patients in a mental-health facility.[9] It seems to me that how residents of mental-health facilities are housed, supervised, and protected from harming themselves or others involves the "provision of medical services." Ex parte Vanderwall, 201 So.3d at 537. Altapointe was not operating a hotel; it was operating a residential mental-health facility. Crenshaw was not a guest; he was a patient. A decision regarding whether the residents posed a danger to themselves or others, and how those residents should be housed to prevent such danger, involves a medical/psychological determination, not the decision of a layperson.
The main opinion states: "Because there is no evidence before us that would permit us to conclude that the assault on Hunter was somehow linked to the administration of medical care or professional services by Altapointe, we cannot say that the AMLA
*1120 applies to Avnet's claims." 249 So.3d at 1113. If the main opinion's holding is indeed based solely on a perceived failure to produce evidence, then the decision in this case is limited and should not be read broadly as adopting a blanket rule prohibiting the application of the AMLA in cases alleging tortious acts committed by mental-health patients under the care of a medical provider.

See Ala. Code 1975, § 6-5-480 et seq. and § 6-5-540 et seq.

As does the main opinion, I use the name "Altapointe" to refer collectively to the petitioners Altapointe Health Systems, Inc., and Altapointe Healthcare Management, LLC.

These arguments were made nearly verbatim in the trial court.

The Court's application in this case of both the psychotherapist-patient privilege and Ala. Code 1975, § 22-21-8, demonstrates that there was no dispute that Crenshaw was receiving psychological care and that the "group home" was a medical facility.